[Civ. No. 8918. Second Appellate District, Division Two.—November 2, 1933.]

ALICE D. MOFFITT, Respondent, v. FORD MOTOR COMPANY (a Corporation), Appellant.

Kidd, Schell & Delamer, Redman, Alexander & Bacon and Herbert Chamberlin for Appellant.

Benjamin M. Stansbury, Paul Vallee and Mott, Vallee & Grant for Respondent.

STEPHENS, P. J.—In the main, we adopt appellant's statement of the case, but because of a few deletions and changes we do not use quotation marks.

The appeal is by the defendant Ford Motor Company, a Delaware corporation, from a judgment for $16,573.63, after jury verdict in an action for personal injuries.

The complaint in the action was filed December 1, 1928, and was directed against a number of defendants. It alleged that the defendants conducted an exhibition designated the Ford Show, commencing December 2, 1927, at the auditorium on the grounds of the Ambassador Hotel in Los Angeles, and that plaintiff attended the exhibition at the invitation of the defendant and was injured while utilizing an exit from the auditorium. The prayer, as afterwards amended, sought total damages in the sum of $56,573.63, to wit: $6,573.63 special damages for medical and allied expenses, and $50,000 general damages. The complaint in its final form also alleged negligence in the following respects: "The general level of the floor at the exit was approximately 13½ inches above the general ground level immediately outside the exit. The surface of the ground immediately outside the exit was rough and uneven." The answer of the defendant Ford Motor Company admitted its corporate capacity and entity, and was a general denial as to the other allegations of the complaint in its final form, with the special defense of contributory negligence.

The trial resulting in the present judgment was the second one. The first trial was had in October, 1929, and resulted in the court's granting defendant's motion for nonsuit upon the opening statement of plaintiff's counsel. On January 10, 1930, plaintiff's motion for a new trial was

10

granted. The defendant prosecuted an appeal from this order, and during the pendency thereof respondent moved to dismiss the appeal. This court granted the motion to dismiss upon the ground that the order was nonappealable under the circumstances. (*Moffitt* v. *Ford Motor Co.*, 63 Cal. App. Dec. 637 [292 Pac. 698].) On hearing therein the Supreme Court reached a different conclusion and denied the motion to dismiss. (*Moffitt* v. *Ford Motor Co.*, 212 Cal. 73 [297 Pac. 553].) The respondent thereafter moved to affirm the order granting a new trial or to advance hearing of the appeal on the calendar. This court denied the motion to affirm, but granted the motion to advance. (115 Cal. App. 499 [1 Pac. (2d) 994].) After hearing on the merits the order granting plaintiff a new trial was affirmed. (117 Cal. App. 247 [3 Pac. (2d) 605].) The second trial commenced April 13, 1932, and ended April 28, 1932. It resulted in a verdict against the defendant Ford Motor Company for $16,573.63, and in favor of all other defendants named. Judgment was entered upon the verdict. Defendant company's motion for a new trial having been denied, it prosecutes this appeal.

The defendant Ford Motor Company concedes on the appeal that it conducted the exhibition designated the "Ford Show". It concedes that plaintiff attended the exhibition at its invitation, and that its duly authorized agents directed plaintiff to retire by the exit at which she was injured. It also concedes that plaintiff incurred $6,573.63 medical and allied expenses as the result of her injuries.

The appellant relies upon the following points for reversal of the judgment: (1) The judgment lacks evidentiary support for the reason that the evidence fails to establish that any breach of duty by the defendant Ford Motor Company proximately caused or contributed to plaintiff's injury. (2) Prejudicial misconduct and reversible error committed by plaintiff's counsel at the trial, in bringing before the jury the fact that the defendant Ford Motor Company was protected by liability insurance in connection with the Ford Show. (3) The jury was misled to the prejudice of the defendant Ford Motor Company by instructions erroneously charging such defendant with the duty of keeping the passageways from the Ambassador auditorium in absolutely safe condition, and erroneously charging such defendant with lia-

bility if any of its agents knew or should have known that the passageways were in an unsafe or dangerous condition. (4) The verdict for $16,573.63 is disproportionate to any reasonable compensation warranted by the evidence and is therefore excessive as a matter of law.

With the advent of the model A Ford in 1927 the Ford Motor Company arranged exhibitions for the display of the new product throughout the United States. The exhibition in Los Angeles was conducted at the auditorium on the grounds of the Ambassador Hotel, and for that purpose the auditorium was rented for a period of four days commencing December 2, 1927. A general invitation was extended to the public to attend the exhibition, and the doors were opened for their patronage on December 2d at about 10:30 A. M. Approximately 65,000 people attended the exhibition that day. They were admitted through the main entrance in the east wall of the auditorium, and until about 3 P. M. departed through doors adjacent to the main entrance. As the day advanced the crowds became congested, and around 3 P. M. doors (used ordinarily for freight) were opened in the south wall of the auditorium for the exit of patrons. At the southeast door thus opened there was a step down approximately 13 inches high, and the ground outside was not paved, but was in a somewhat natural state, with hard clods of dirt and rocks present. During the day some unidentified person or persons carried on grading operations to the south of the southeast door, but no fresh dirt was deposited within 20 feet of the door. Between the hours of 3 P. M. and 4 P. M. of December 2, 1927, vast crowds retired from the auditorium by the southeast door, and after using the step down turned either to the left and passed to a sidewalk about 40 feet away or turned to the right and passed to an alley leading out to Eighth Street. From the record it does not appear that any patron other than plaintiff was injured in using the southeast exit.

Accepting the general invitation, plaintiff entered the exhibition through the main entrance at about 3 P. M. of December 2d, and after viewing the exhibition was directed to retire from the auditorium by the southeast exit. She was 73 years old and unescorted. About 4 P. M. she started out the southeast exit with some 25 to 40 other patrons. She stepped down from the auditorium floor to the ground out-

side and fell. At this point we have deleted the following from the original statement of appellant: " . . . and stepped on some unidentified object which cut her right shoe, turned her right ankle and caused her to fall to the ground", and have added in place thereof the words "and fell". . The subject "unidentified object" will play an important part in the analysis of the evidence. A fracture of the femur bone of the right hip resulted. First aid treatment was administered at the receiving hospital and Mrs. Moffitt was then taken to a private hospital, where the fracture was reduced by her own physicians and a cast applied. She returned to her home after six days and remained in bed for approximately six months. A brace was substituted for the cast in April of 1928, and she wore the brace for about a year. During her period of inactivity, bladder trouble developed. At the time of the trial she was using a cane. Physicians and nurses were in constant attendance upon her, and as she progressed physiotherapy treatments were administered. At the time of the injury she derived her living by renting rooms, and had a ten-room house with four apartments outside; and it was her claim that her injuries had incapacitated her from attending to the wants of these tenants. The evidence disclosed, however, that she had a constant flow of housekeepers at the premises.

Herein we treat appellant's first point, to wit: The judgment lacks evidentiary support for the reason that the evidence fails to establish that any breach of duty by the defendant Ford Motor Company proximately caused or contributed to plaintiff's injury.

Following the method of appellant in presenting its argument we shall at once agree in intent with the text of its brief, but not with the exact wording, wherein it states the following: "Under settled and governing law the appellant owed to its invitee the duty of maintaining the auditorium and its immediate approaches in a reasonably safe condition, and of exercising reasonable care in protecting her from injury. This duty, however, under equally settled and governing law was not absolute. The appellant was not an insurer of the safety of its invitee. It was not bound at its peril to keep the auditorium and its approaches absolutely safe. Its duty depended upon whether or not it had express or implied notice that a dangerous condition ex-

isted." (*Mautino* v. *Sutter Hosp. Assn.*, 211 Càl. 556 [296 Pac. 76].) Appellant then asks the question: "Was the appellant guilty of a breach of duty to the respondent which approximately [sic] caused or contributed to her injury?" To understand this question we quote from the testimony of the respondent, most óf which appellant quotes in its brief: "Q. Did you go out? A. I started out, yes. Q. You started out, where did you start out? A. Well, I started—when I started out, I started for the same door that I came in. Q. That was the east door? A. At the east door, not thinking but what I could go out there and the man says, 'You can't go out here, you go out there,' and he motioned to the other door. Q. When you say, 'go out there', and motioned, and indicated where to go, where did he indicate? A. To the southeast door. Q. What did you do then? A. Well, everybody was going, a great many people were going out that way and I went right along with them, but I fell, I stepped on something and turned my ankle and fell. Q. Where was that? A. Right close to the door, the first step I took. Q. Outside or inside? A. Outside. Q. The first step that you took down? A. The first step I took down I fell. Q. And then what happened? A. What? Q. What happened then? A. Well, someone picked me up and sat me in the doorway. Q. Were there many people at the show? A. Yes, there was quite a good many there. Q. Were there many going out at the same time you went out? A. Yes there was a crowd going out. Q. About how many? A. Oh, I don't know, I should think about at least 25 or so. Q. How close were you to the other people there as you were going out? A. Well, we were all going out together, one right after the other. Q. Close enough to touch .them? A. Yes. Q. Did you see the—what was the condition of the ground? A. I didn't see that before I stepped, we was all close together and I couldn't see where I stepped, but it was very rough. . . . Q. Well, you say that immediately after the accident you sat on the door step and you looked down at your foot? A. After I sat there I saw that my foot was turned back like that (indicating). Q. Now, you looked down at your foot; what did you see on the ground in the vicinity of your foot? A. Well, I don't know that I noticed the ground. Q. Did you see any rock there? A. I didn't notice any—I didn't notice the ground. Q. But you didn't

see any rock? A. I don't know that I did; I didn't notice it. Q. No—you didn't observe it? A. I noticed it was a dirt ground that I stepped on; there was no walk—there was no cement walk; there was nothing but dirt. Q. And so far as you can swear now of your own knowledge, so far as you can testify—of your own knowledge now—there was no foreign substance there at all, was there? A. There was something that I stepped on that turned my foot; whether it was a rock or a little bit of clay, or whatever it was, there was something that cut my shoe, anyway. Q. But you didn't see it, did you? A. I didn't think to look to see what it was; I had other things to think of just then; I was suffering. I didn't faint away because I never fainted in my life, but I was about as white as that handkerchief (indicating), and they all noticed that. Q. Now, how many steps were there as you stepped out from that hallway? A. Oh, just about one step, but it was not a hallway, it was the main room of the auditorium. Q. Just one step? A. I think the first step I took down, I stepped with my right foot and I fell. Q. The one step took you down to the street, did it? A. Oh, certainly, but it was not a street. Q. There wasn't a series of steps there? A. No."

Quoting from the testimony of Police Officer Charles C. Kagley: "The ground was rather uneven and bumpy out there; it wasn't just smooth, where you stepped from onto it." Lawrence A. Valli, an employee of Ford Motor Company, likewise testified: "Q. Can you state what was the condition there of the landing immediately outside of the step? A. Immediately outside of the step the ground was rough and clods and dirt and rocks over on the ground there. Q. Can you state whether the clods of dirt that were there appeared to be hard or soft? A. They appeared to be hard." The shoe mentioned had a tear in the cloth covering the heel. Appellant then proceeds to present in his brief those cases holding that an accident caused by the presence of a foreign substance on a floor, or by a faulty condition of a floor covering, is not enough upon which to base a recovery for resulting injuries. It must also be shown that the invitor knew or by reason of the circumstances obtaining should have known the facts, and in time for him to have cured the fault. Appellant contends that the evidence in the instant case shows that there was some

foreign substance entirely unidentified which caused the accident; that there is no evidence tending to show that appellant had anything to do with or knew anything about such foreign substance. With due respect for the earnestness with which this premise is presented we are compelled to differ with appellant.

We are bound to resolve every reasonable question as to the meaning of the evidence in favor of the verdict. Respondent was directed to leave the auditorium by a different door than she entered. She was in a crowd where the people were close enough to touch each other. She observed a step down and took it, but it was much more than an ordinary step down. The ground upon which all of the pedestrians leaving that door were compelled to step was loose and cloddy. She stepped down and with that step—not a subsequent one—she fell, injured. The felt covering of her shoe heel was torn, her ankle had turned. There was no need here for the jury to have believed that some foreign substance such as someone might have dropped there was the cause of the fall and injury. Knowledge as to the condition of the rough landing and extra height of the step is not denied by appellant. Respondent, an elderly lady and unattended, followed directions and with the crowd stepped down an unreasonably long or high step onto a rough, cloddy, earthen surface. She was precipitated to the ground and injured. Can it be that because the injured one cannot swear just what piece of hard substance resisted the pressure she put upon it as she let herself down, appellant is for that reason relieved from any and all responsibility? We think not. The clods were sufficient to have caused the turn of the ankle. Appellant knew the clods were there. Comparing the situation with the floor scrap cases, it is plain that one falling upon the floor from a slip, scraps being on the floor, would not have to positively identify the exact scrap her foot pressed upon. These conditions and circumstances would present the question to the jury as to whether or not the scraps caused the fall.

The second point upon which appellant seeks a reversal of the judgment is expressed in the opening brief as follows: "Prejudicial misconduct and reversible error was committed by plaintiff's counsel at the trial in bringing before the jury the fact that the defendant Ford Motor

Company was protected by liability insurance in connection with the Ford Show." This point arises from the following facts: The first witness called by the plaintiff was Walter E. Fowler, a defendant whose answer was on file in the action. He was chairman of the Ford Dealers Advertising Committee, of Los Angeles County, in whose name the Ambassador auditorium was rented for the purpose of the exhibition. He was interrogated by plaintiff's counsel under section 2055 of the Code of Civil Procedure respecting conversations preliminary to the exhibition occurring between representatives of the dealers and representatives of the Ford Motor Company. The matter appears in the record as follows: "Q. Was the Ford Show matter and the putting on of the Ford Show, discussed also? A. Well, this committee was appointed long before, a long time before the Ford Show was ever put on. Q. Yes, but was that matter actually discussed? A. Previous to the show it was. Q. And what was the—and what was said concerning that, or what was done? The Court: By whom? Q. By Mr. Stansbury (continuing): Who was present? A. Well, with reference—those that I have mentioned that were at the Ford Motor Company down here, and the conversation was general and then it was decided to go into the matter and look it up and we went out to the Ambassador Auditorium, and the Auditorium was inspected and Mr. Capek said it was suitable and that he would put on the show out there if the Ford dealers would pay the rent, and he instructed me at that time to sign the lease. I asked him if I should place the insurance and he said he would take care of that, that he would take care of all the details and all of the expenses other than the rent. Q. *What insurance did he mention? A. Liability Insurance.*" (Italics appellant's.)

Upon the occurrence of the above an objection was interposed, but not in time to prevent an answer to the question put by respondent's counsel. The court ordered the answer stricken and that the objection should precede the answer in the record. Counsel and the court then retired to the court's chambers, and without the jury's presence counsel for appellant moved that the court declare a mistrial on the ground of misconduct of counsel for respondent in bringing in the insurance question. This motion was denied and nothing further regarding the incident was done. It has

been held under certain conditions that it is reversible error . for the plaintiff in a damage action to inject into the evidence any reference to the carrying of liability insurance by a defendant, but we do not think plaintiff in the instant case did this and we see no abuse of discretion of the trial court in finding that counsel was not guilty of misconduct. The latter appears to have been examining a party under the provisions of section 2055 of the Code of Civil Procedure, trying to ascertain the real party who was putting on the Ford Show. Counsel was pursuing a legitimate and material inquiry, when the witness mentioned that the Ford Motor Company's representative said to him that the auditorium would be satisfactory and that he would proceed with the show if the Ford dealers would pay the rent. The witness, continuing without any intervening question, said he asked if he should place the insurance. The motor company representative said that he would take care of that and everything but the rent. It was then that the complained of question was asked and answered.

Counsel for respondent was within the legitimate limits of cross-examination and there is nothing whatever to indicate that counsel had any idea that the answer would be related to the touchy question of liability insurance. The situation was very different from *Squires* v. *Riffe*, 211 Cal. 370 [295 Pac. 517], or· *Citti* v. *Bava*, 204 Cal. 136 [266 Pac. 954]. We do not understand any of the cases to go so far as to make the introduction of the subject of liability insurance fatal to a trial where it enters the case in a legitimate manner and for a legitimate purpose. A reading of the cases cited by appellant will disclose no such ruling. But they all show that the harm came from plaintiff's own examination. It may also be remarked that the answer did not necessarily mean indemnity insurance to the patrons of the show; it might have meant, as respondent suggests in her brief, employer's liability insurance. (*Rising* v. *Veatch*, 117 Cal. App. 404 [3 Pac. (2d) 1023] ; *Dullanty* v. *Smith*, 203 Cal. 621 [265 Pac. 814] ; *Lahti* v. *McMenamin*, 204 Cal. 415 [268 Pac. 642] ; *Hodge* v. *Weinstock, Lubin & Co.*, 109 Cal. App. 393 [293 Pac. 80] ; *Noble* v. *Bacon*, 129 Cal. App. 177 [18 Pac. (2d) 699].)

Herein we shall consider appellant's exception to claimed defective instructions. The two instructions claimed

by appellant as erroneous and as prejudicial to appellant are the following, both of which were requested by respondent. The second one quoted immediately follows the first one as given by the court and appellant claims that they are related. We have used italics exactly as appellant used them in its brief:

"If you find from the evidence that defendants or any of them were engaged in conducting a Ford Show which they or any of them invited the public to visit or patronize, then *I instruct you that it was the duty of the defendants conducting such show to keep the entrances and passageways to and from the premises as so occupied and used by them in a safe condition* and to use ordinary care to avoid accidents or injury to those properly and lawfully entering upon or leaving the premises through such entrances or passageways in connection with visiting such show."

"If you find that the entrance or passageway at which it is alleged plaintiff was injured was in an unsafe and dangerous condition and that such condition was the proximate cause of the injuries to plaintiff, *the defendants, if any, engaged in conducting said Show are liable therefor if their managers, officers, or agents knew of such alleged condition, or if, as careful and prudent men, they should have known it, provided that plaintiff was in the exercise of ordinary care.*"

There is no doubt whatever but that the first-quoted instruction misstates the law, though it is exactly what appellant concedes in our opening quotation from his brief. Appellant is correct when it says later on in its brief that it is the duty of the appellant to exercise reasonable care to keep the premises in a safe condition rather than its duty to keep them in a safe condition. (*Mautino* v. *Sutter Hosp. Assn.*, 211 Cal. 556 [296 Pac. 76].) But we think this error could not have affected appellant for reasons which we shall particularize in our comment upon both criticised instructions.

As to the second quoted instruction appellant registers three complaints: That it repeats the error of the first criticised instruction; that it makes appellant responsible for the information of "managers, officers, or agents", whereas in fact it is responsible only for knowledge of such within their scope of authority; that it omits the necessary

item of time, by holding appellant responsible for knowledge even though such knowledge was not obtained in time to remedy the condition before the accident.

A reading of all the given instructions in narrative reveals numerous statements of the correct rule on all of the points objected to by appellant and it would hardly seem possible that the jury could have misunderstood the law upon any of these points. Of course, we understand that even section 4½ of article VI of the Constitution will not relieve mistaken and erroneous instructions where the issue is such that the jury could very well have followed an erroneous course through an erroneous direction of an instruction, but such is not the case here.

We are convinced that an erroneous premise as to fact has been assumed by appellant for his analysis of this case. Appellant bases his case upon the theory that some foreign substance on the ground caused the accident. By foreign substance he means something other than the effect of the over-high step and something other than the hard clods of dirt and rocks in the rough ground upon which respondent, in a close crowd, was directed to step. In this, as previously herein made plain, we regard appellant as in error. Looking at these instructions in the light that we have explained and in which the jury had a right to view them, no harm was suffered by the terms of the two criticised instructions for the following reasons: There is no issue in the case as to the step from the auditorium door sill to the ground being almost twice as high as an ordinary one. There is no issue as to whether or not the ground immediately under and away from this step was rough, and contained hard clods and rocks. There is no issue as to the knowledge of appellant that this condition existed. It is apparent that appellant could not direct people to pour out of a freight door, over an unusually high step to a rough, cloddy and rocky terrain, and excuse itself from liability for resulting injuries by saying, ''I have no responsibility in the matter; I knew nothing about these things.'' It was its duty to know. Therefore the difference between the expressions ''duty to keep the premises safe'' and ''duty to use reasonable care to keep them safe'' can make no difference in this case. It is apparent that appellant knew of the dangerous condition, and that it left it that way and made no attempt to remedy

it. The same reasoning also completely nullifies any objection to the instructions upon the score that the knowledge of "managers, officers or agents" is not imputable to it except within the scope of their authority. Appellant was bound to know the condition of the exit through which it directed its invitees to go, and was bound to know the condition of the terrain upon which it directed them to step. In addition to this, there is no contention but that the managers knew of this condition. It becomes of no importance, then, what knowledge the instruction imputed to the "managers, officers and/or agents". The other criticism is as to time; that is, that knowledge of the defective condition must reach the invitor in time for it to take action to remove the dangerous condition before liability can be fastened upon it. But this argument is ineffectual because the condition was present in the instant case when the doors were opened. Admittedly, if the case presented any question of a foreign substance having been placed in the pathway by someone after the doors were opened, such as a broken bottle, the objections to these instructions would be vital and, too, appellant's general argument throughout the case would be germane.

█ The conceded special damages leaves an even $10,-000 general award. In view of all of the facts of the case we cannot say that the size of this award shows that it was arrived at through passion, prejudice, sympathy or misunderstanding.

The judgment is affirmed.

Craig, J., and Archbald, J., *pro tem.*, concurred.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on December 28, 1933.